JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
PETER J. MCVEIGH
Attorneys
Environment & Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 2139
Washington, D.C. 20530

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| THE STATE OF CALIFORNIA; GAVIN | ) | **COMPLAINT** |
| C. NEWSOM, in his official capacity as | ) | |
| Governor of the State of California; THE | ) | |
| CALIFORNIA AIR RESOURCES BOARD; | ) | |
| MARY D. NICHOLS, in her official | ) | |
| capacity as Chair of the California Air | ) | |
| Resources Board and as Vice Chair and a board member | ) | |
| of the Western Climate Initiative, Inc.; WESTERN | ) | |
| CLIMATE INITIATIVE, INC.; JARED | ) | |
| BLUMENFELD, in his official capacity as Secretary | ) | |
| for Environmental Protection and as a board member | ) | |
| of the Western Climate Initiative, Inc.; KIP LIPPER, | ) | |
| in his official capacity as a board member of the | ) | |
| Western Climate Initiative, Inc., and RICHARD | ) | |
| BLOOM, in his official capacity as a board member | ) | |
| of the Western Climate Initiative, Inc., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, the United States of America, alleges as follows:

## <u>INTRODUCTION</u>

1.      The Constitution gives the federal government full and exclusive responsibility to conduct this nation's foreign affairs, representing as it does the collective interests of all its states and territories.

2.    As the Supreme Court has accentuated, "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference."  *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941).

3.    Notwithstanding the breadth and exclusivity of the federal government's responsibility for foreign affairs, Defendants have pursued, or are attempting to pursue, an independent foreign policy in the area of greenhouse gas regulation.  Specifically, Defendants have intruded into the federal sphere by entering into a cap-and-trade agreement with the provincial government of Quebec, Canada (the "Agreement").  This intrusion complexifies and burdens the United States' task, as a collective of the states and territories, of negotiating competitive international agreements.  Moreover, California's actions, as well as the actions of those acting in concert with it, have had the effect of enhancing the political power of that state vis-à-vis the United States.  This is due not only to the effect of the Agreement itself but also stems from the fact that the Agreement could encourage other states to enter into similarly illegal arrangements.

4.    The design of the Constitution requires that the federal government be able to speak with one voice on behalf of the United States in matters of foreign affairs.  Allowing individual states in the Union to conduct their own foreign policy to advance their own narrow interests is thus anathema to our system of government and, if tolerated, would unlawfully enhance state power at the expense of the United States and undermine the United States' ability to negotiate competitive international agreements.

5.    Because the Agreement, together with certain related provisions of California law, violate the Constitution, this Court should declare them unlawful and enjoin their operation.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

7.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside here and because a substantial part of the acts or omissions giving rise to this Complaint arose from events occurring within this District.

8.      This Court has authority to provide the relief requested under 28 U.S.C. §§ 1345, 1651, 2201 and 2202, and under its inherent legal and equitable powers.

## THE PARTIES

9.      Plaintiff, the United States of America, has full and exclusive responsibility to conduct the foreign policy of the nation.

10.      Defendant State of California is a state of the United States.

11.      Defendant Gavin C. Newsom is Governor of the State of California and is sued in his official capacity.

12.      Defendant California Air Resources Board ("CARB") is an agency of the State of California.  It has primary responsibility for implementation of the Agreement.

13.      Defendant Mary D. Nichols is Chair of CARB and Vice Chair and a voting board member of the Western Climate Initiative, Inc. (WCI), and is sued in her official capacity.

14.      Defendant WCI is a non-profit corporation organized under the laws of Delaware. WCI is headquartered in Sacramento, California.  *See* 2018 Tax Return, *available at* http://www.wci-inc.org/fr/docs/TaxForm-USA2018-EN-20190514.pdf at 1 (last visited October 22, 2019).  According to its charter, its first purpose is "to provide technical and scientific advisory services to States of the United States and Provinces and Territories of Canada in the development and collaborative implementation of their respective greenhouse gas emissions trading programs."  Certificate of Incorporation of Western Climate Initiative, Inc., § 3, *available at* http://wci-inc.org/docs/Certificate_of_Incorporation.pdf (last visited October 22, 2019).

15.      WCI is a state actor and an instrumentality of the governments of California, Quebec, and Nova Scotia.  WCI's bylaws provide that the Class A voting board members representing the State of California must be "employee[s] or officer[s] of the state, named in accordance with the state's requirements."  *See* By-Laws of the Western Climate Initiative, Inc., Art. IV, § 4.2(a), *available at* http://wci-inc.org/docs/WCI%20Inc%20Bylaws_10-11-2018.pdf (last visited October 22, 2019).  The Class B non-voting board members representing the State of California also must be "employee[s], officer[s] or elected officer[s] of the jurisdiction."  *Id.* § 4.2.

16.     Defendant Jared Blumenfeld is the California Secretary for Environmental Protection and a voting board member of WCI, and is sued in his official capacity.

17.     Defendant Kip Lipper is an employee of the California State Senate and a non-voting board member of WCI, and is sued in his official capacity.  Mr. Lipper was appointed to the board by the California Senate Rules Committee.

18.     Defendant Richard Bloom is a state assembly member and a non-voting board member of WCI, and is sued in his official capacity.  Mr. Bloom was appointed to the board by the Speaker of the California Assembly.

19.     Defendants the State of California, Governor Newsom, CARB, Chair Nichols, WCI, Secretary Blumenfeld, Assembly Member Bloom, and Mr. Lipper are referred to collectively as "California" or as "Defendants."

## APPLICABLE LAW

20.     The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Art. VI, cl. [2].

21.     The Constitution prohibits states from "enter[ing] into any Treaty, Alliance, or Confederation."  Art. I, § 10, cl. [1].

22.     The Supreme Court has recognized and held that, "[w]hen a State enters the Union, it surrenders certain sovereign prerogatives.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] *it cannot negotiate an emissions treaty with China or India . . . .*"  *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (emphasis added).

23.     The Constitution prohibits states, "without the Consent of Congress," from "enter[ing] into any Agreement or Compact . . . with a foreign Power . . . ."  Art. I, § 10, cl. [3].

24.     The Constitution gives Congress "Power . . . [t]o regulate Commerce with foreign Nations . . . ."  Art. I, § 8, cl. [3].

25.     The Supreme Court has interpreted the Foreign Commerce Clause to have a negative application, in the sense that state laws that discriminate against, or impose an undue

burden upon, foreign commerce, are unconstitutional even in the absence of federal legislation regulating the activity in question.  *See Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 310-13 (1994).

26.      Even aside from his military powers as the "Commander in Chief of the Army and Navy," Art. II, § 2, cl. [1], the Constitution vests broad responsibility for the conduct of foreign affairs in the President of the United States.

27.      The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."  *Id.* cl. [2].

28.      The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls."  *Id.*

29.      The President "receive[s] Ambassadors and other public Ministers."  *Id.* § 3.

30.      The Constitution authorizes the President to "take Care that the Laws be faithfully executed."  *Id.*

31.      The Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the states that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise implicate the conduct of foreign policy.  *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418-20 (2003).

## THE UNITED STATES' FOREIGN POLICY

32.      The United States has demonstrated an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security.  It has "in fact . . . addressed" these interwoven issues on a number of occasions.  *Id.* at 421.

33.      In 1992, President George H. W. Bush signed, and the Senate unanimously approved, the United Nations Framework Convention on Climate Change ("UNFCCC"), with a stated objective of "stabilization of greenhouse gas concentrations in the atmosphere at a level that would prevent dangerous anthropogenic interference with the climate system."  *Id.*, Art. 2.

///

34.     The UNFCCC does not set binding limits on greenhouse gas ("GHG") emissions for individual countries.  It contains no enforcement mechanism.  Instead, it explains how signatories may negotiate specific international agreements (often referred to as "protocols") in pursuit of the UNFCCC's objective.

35.     One agreement under the UNFCCC is the Kyoto Protocol of 1997.  This protocol imposed mandatory GHG emission reduction targets on the United States and other UNFCCC Annex I parties.  The protocol placed heavier burdens on the Annex I parties than on economically developing countries.

36.     Although the United States initially signed the protocol, President Clinton never submitted it to the Senate for ratification.  Instead, the Senate passed a unanimous resolution expressing disapproval of this protocol specifically, and generally of any other protocol that similarly provided for disparate treatment of economically developing countries.  S. Res. 98, 105th Cong. (1997).

37.     On December 12, 2015, the parties to the UNFCCC agreed to the Paris Climate Accord (the "Accord").[1]

38.     The Accord sets forth a goal of preventing global temperatures from rising more than two degrees Celsius above pre-industrial levels or, if possible, limiting the increase to 1.5 degrees Celsius.

39.     The Accord tasks each nation with the responsibility to develop its own climate plans, referred to as "nationally determined contributions."  Paris Accord, Art. 4.2.  Under its terms, a party may withdraw from the Accord one year after providing notice of intent to withdraw, but such notice may be given no earlier than three years after the Accord has entered into force for that country.

40.     President Obama accepted the Accord on behalf of the United States by executive action in September 2016.

///

---

[1] We refer to the "Paris Agreement" as the "Paris Accord" to avoid confusion between that agreement and the Agreement that is the main focus of this Complaint.

41.     On June 1, 2017, President Trump announced that the United States intended to withdraw from the Accord and to begin negotiations to either re-enter it or negotiate an entirely new agreement on terms more favorable to the United States.

42.     The President stated that withdrawal was necessary because, among other things, the Accord: (1) undermined the nation's economic competitiveness and would cost jobs; (2) set unrealistic targets for reducing GHG emissions while allowing China to increase such emissions until 2030; and (3) would have negligible impact in any event.

## CALIFORNIA'S FOREIGN POLICY

43.     In 2006, Arnold Schwarzenegger, Governor of California at the time, declared that California was a "nation state" with its own foreign policy.  Douglas A. Kysar & Bernadette A. Meyler, *Like a Nation State*, 55 U.C.L.A. L. Rev. 1621, 1622 (2008) (quoting Governor Schwarzenegger).  He said this as Tony Blair, Prime Minister of the United Kingdom, stood by his side.  *Id.  See also* Adam Tanner, *Schwarzenegger: California is 'Nation State' Leading World*, Washington Post (Jan. 9, 2007) ("'We are the modern equivalent of the ancient city-states of Athens and Sparta.  California has the ideas of Athens and the power of Sparta,' Schwarzenegger . . . told legislators . . . .  'Not only can we lead California into the future . . . we can show the nation and the world how to get there.  We can do this because we have the economic strength, the population, the technological force of a nation-state.'") (paragraph break omitted), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/01/09/AR2007010901427.html (last visited October 22, 2019).  Governor Schwarzenegger's assertions about California's powers are demonstrably at odds with the state's "surrender[]" of "certain sovereign prerogatives" upon entering the Union.  *Massachusetts*, 549 U.S. at 519.

44.     In the wake of the United States' announcement that it intends to withdraw from the Accord — in part because it favors China — California (by or through one or more of the other Defendants) has entered into numerous bilateral alliances, confederations, agreements, or compacts on environmental issues with national and subnational governments in China.

///

///

45.     Indeed, mere days after President Trump announced the United States' intent to withdraw from the Paris Climate Accord, Jerry Brown, then-Governor of California, met in Beijing with China's President Xi Jinping to discuss environmental issues.

46.     In 2017, in what the states in question called a direct response to the United States' announcement that it intended to withdraw from the Accord, California and other states entered into the United States Climate Alliance, committing to reducing GHG emissions in a manner consistent with the goals of the Accord. *See* Attachment A at 12 (explaining that the United States Climate Alliance was founded "in response to President Trump's decision to withdraw from the Paris Agreement").[2]

47.     According to California, the state is a party to 72 active bilateral and multilateral "agreements" with national and subnational foreign and domestic governments relating to environmental policy. *See generally* Attachment A. Additionally, California states that the purpose of these agreements is "to strengthen the global response to the threat of climate change and to promote a healthy and prosperous future for all citizens." https://www.climate change.ca.gov/climate_action_team/partnerships.html (last visited October 22, 2019).

48.     In 2013, CARB on behalf of California entered into the predecessor of the Agreement with the provincial government of Quebec, Canada. *See* Agreement Between the California Air Resources Board and the *Gouvernement du Québec* Concerning the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions. The Agreement, as renegotiated in 2017, obliges California to work with Quebec "toward the harmonization and integration of [their] greenhouse gas emissions reporting programs and cap-and-trade programs for reducing greenhouse gas emissions." *See* Agreement on the Harmonization and Integration of Cap-and-Trade Programs for Reducing Greenhouse Gas Emissions at Art. 1 (attached hereto as Attachment B).

49.     The Agreement facilitates the California Global Warming Solutions Act of 2006, (AB 32), which requires the state to reduce its GHG emissions to their 1990 level by 2020 and to

---

[2] Attachment A amalgamates text from https://www.climatechange.ca.gov/climate_action_team/ partnerships.html (last visited October 22, 2019).

1     "*facilitate the development of integrated* and cost-effective regional, national, and *international*

2     *greenhouse gas reduction programs*."  CAL. HEALTH & SAFETY CODE § 38564 (emphasis added).

3          50.     The Agreement facilitates a comparable program in Quebec.

4          51.     "Cap-and-trade" refers to a regulatory system that imposes a cap on GHG

5     emissions, grants regulated entities "emission allowances"—entitling them to emit a specified

6     quantity of GHGs—and creates a market in which regulated entities may buy and sell

7     allowances.

8          52.     Before entering the Agreement, California had promulgated regulations to

9     establish an internal cap-and-trade system in 2011.  *See* 17 Cal. Code Regs. ("CCR") §§ 95801-

10    96022.  However, California's regulations explicitly contemplated that that "compliance

11    instrument[s] issued by an external greenhouse gas emissions trading system (GHG ETS) may be

12    used to meet" the state's regulatory requirements.  17 CCR § 95940.  By formulating its

13    regulations in this fashion, California built its cap-and-trade system in anticipation of expansion

14    beyond state lines.

15         53.     Covered entities include manufacturers, electric power generation facilities,

16    natural gas suppliers, importers of electricity and natural gas, intrastate pipelines and others

17    whose annual GHG emissions equals or exceeds specific thresholds.  *See id.* §§ 95811-12.  Upon

18    information and belief, many covered entities have substantial interstate or foreign activities.

19         54.     The regulations establish three separate compliance periods: (1) 2013-2014; (2)

20    2015-2017; and (3) 2018-2020.  *See id.* § 95840.  Under a complex formula, each covered entity

21    has a compliance obligation for each compliance period.  The obligations call for a steady

22    reduction in GHG emissions for each successive compliance period.  *See id.* §§ 95850-95858.

23         55.     The regulations establish two types of "compliance instruments": greenhouse gas

24    emissions allowances ("GHG allowances") and "offset credits."  *See id.* § 95820.  One unit of

25    each instrument authorizes a covered entity to emit up to one metric ton of $CO_2$ or $CO_2$-

26    equivalent of any of the GHGs covered by the regulations.  *See id.* § 95820(c).

27         56.     Under the regulations, CARB distributes GHG allowances to covered entities

28    through various methods.  *See, e.g., id.* § 95890.  Covered entities may obtain additional

allowances by purchasing them during periodic auctions, *see id.* §§ 95910-95915, or from other authorized parties, *see id.* §§ 95920-95922.

57.     A covered entity alternatively can obtain an offset credit by undertaking a project designed to remove $CO_2$ from the atmosphere.  *See id.* § 95970(a)(1).

58.     The Agreement obligates California and Quebec to "consult each other regularly" and to "continue to examine their respective [cap-and-trade] regulations . . . to promote continued harmonization and integration of the Parties' programs."  Attachment B at Arts. 3, 4.

59.     The Agreement provides that "auctioning of compliance instruments by the Parties' respective programs shall occur jointly."  *Id.*, Art. 9.

60.     Under the Agreement, covered entities in California are authorized to trade emission allowances with covered entities in Quebec, and vice-versa, "as provided for under their respective cap-and-trade program regulations."  *Id.*, Art. 7.

61.     Under 17 CCR § 95940, "[a] compliance instrument issued by an external greenhouse gas emissions trading system (GHG ETS) may be used to meet the requirements [of California's cap-and-trade program] if the external GHG ETS and the compliance instrument have been approved pursuant to this section and [CCR] section 95941.

62.     Under 17 CCR § 95941, CARB "may approve a linkage with an external GHG ETS after complying with relevant provisions of [California's] Administrative Procedure Act and after the Governor of California has made the findings required by [CAL. GOV. CODE § 12894(f)]."

63.     Under 17 CCR § 95942(a), "[o]nce a linkage is approved, a compliance instrument issued by the approved external GHG ETS . . . may be used to meet a compliance obligation under [California's cap-and-trade program]."

64.     Under 17 CCR § 95942(d), "[o]nce a linkage is approved, a compliance instrument issued by California may be used to meet a compliance obligation within the approved [e]xternal GHG ETS."

///

///

65.     Under 17 CCR § 95942(e), "[o]nce a linkage is approved, a compliance instrument issued by the linked jurisdiction may be used to meet a compliance obligation in California."

66.     Under 17 CCR § 95943(a)(1), "covered . . . entities may use compliance instruments issued by the [Government of Quebec] to meet their compliance obligation under [California's cap-and-trade program]."

67.     In sum, under the Agreement, California agrees to accept compliance instruments issued by Quebec to satisfy compliance obligations in California, and Quebec agrees to accept compliance instruments issued by California to satisfy compliance obligations in Quebec.  *See id.*, Art. 6.

68.     Under the Agreement, the parties agree to consult with each other before making changes to their respective offset protocols or to their procedures for issuing offset credits.  *See id.*, Art. 5.

69.     The Agreement represents that it "does not modify any existing statutes and regulations" of either party.  *Id.*, Art. 14.

70.     The Agreement allows each party to withdraw, but requires a party to "endeavour to give 12 months['] notice of intent to withdraw" to the other party.  *Id.*, Art. 17 (European spelling in original).

71.     Termination of the Agreement requires "written consent" of the parties and is not legally effective until "12 months after the last of the Parties has provided its consent . . . ."  *Id.*, Art. 22.

72.     The Agreement and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) have the effect of undermining the ability of the federal government as a whole, and the President in particular, of properly reconciling protection of the environment, promotion of economic growth, and maintenance of national security.

73.     The Agreement and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) have the effect of undermining the ability of

1    the federal government as a whole, and the President in particular, to speak for the United States

2    with one voice on a variety of complex and sensitive subjects of foreign policy.

3         74.    The Agreement and supporting California law as applied (including CAL. HEALTH

4    & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) have the effect of undermining the

5    President's ability to negotiate competitive international agreements in the area of environmental

6    policy.  This is particularly true if California were to make similar arrangements with other

7    foreign powers, or if other states were to do so, in the absence of a declaration by this Court that

8    such arrangements violate the Constitution.  *See*, *e.g.*, WCI's 2018 Tax Return ("Currently, the

9    Board of Directors includes officials from the Provinces of Quebec, Novia [sic] Scotia and the

10   State of California.  The support provided can be expanded to other jurisdictions that join in the

11   future.") (reformatted into sentence case), *available at* http://www.wci-inc.org/fr/docs/TaxForm-

12   USA2018-EN-20190514.pdf at pt. III, § 4a (last visited October 22, 2019).

13        75.    Unless and until this Court declares unconstitutional the Agreement and

14   supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17

15   CCR §§ 95940-43) and enjoins their operation, these provisions will have the effect of harming

16   the United States' ability to manage its relations with foreign states.

17                    **WESTERN CLIMATE INITIATIVE, INC.**

18        76.    In the Agreement, the parties acknowledge that they are "participants of [the]

19   Western Climate Initiative, Inc. (WCI, Inc.), a non-profit corporation incorporated in October

20   2011, providing administrative and technical services to its participants to support and facilitate

21   the implementation of their cap-and-trade programs for reducing greenhouse gas emissions."

22   Attachment B (second "WHEREAS" clause).

23        77.    In February 2012, CARB and WCI entered into an agreement that acknowledges

24   that they (and other "[p]artner jurisdictions") "established [WCI] to provide coordinated

25   administrative and technical support to linked emissions trading programs implemented by the

26   [participating] jurisdictions."  Agreement 11-415 Between Air Resources Board and Western

27   Climate Initiative, Incorporated, Exhibit A ("Agreement 11-415," attached hereto as

28   Attachment C).

78.     In Agreement 11-415, CARB and WCI further acknowledge that WCI "enables cap-and-trade programs to be administered at a lower cost than would be possible with independent administration by each of the WCI [p]artner jurisdictions." *Id.*

79.     According to Agreement 11-415, WCI "provides a framework that can be expanded as more jurisdictions implement their respective programs." *Id.* Nova Scotia became a participating jurisdiction in the WCI in 2018. *See* Funding Agreement, *available at* http://wci-inc.org/docs/Nova%20Scotia%20Funding%20Agreement_for%20web%20posting.pdf (last visited October 22, 2019). "Nova Scotia intends to have regulations in effect in 2018 to establish its cap and trade program that could ultimately be linked to those in place in . . . Quebec and California." *Id.* at 1.

80.     Upon information and belief, WCI serves California, Quebec, and Nova Scotia jointly, not individually, and thus violates the Constitution by complicating and burdening the United States' task of regulating foreign commerce and negotiating competitive international agreements. By the nature of its work and its contractual obligations to participants in the Agreement, WCI is an "other person[] . . . in active concert or participation" (within the meaning of the Federal Rules of Civil Procedure) with the other Defendants to this suit and is aiding and abetting the other Defendants' unlawful actions. As a result, in order for complete relief to be afforded to the United States, WCI must be subject to any injunctive relief that is ordered in this case against the other Defendants.

81.     Provision of joint service by WCI to its member states occurs because of the stated "integrated" nature of the programs, and the proof of such joint service is in the possession and control of Defendants, most particularly WCI.

## **DECLARATORY RELIEF**

82.     The United States incorporates by reference the allegations in Paragraphs 1 to 81.

83.     There is an actual controversy between the United States and Defendants with respect to the constitutionality of the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43).

///

Complaint for Declaratory and Injunctive Relief                                         Page 13

84.     This Court has authority under 28 U.S.C. § 2201(a) to declare the legal rights and obligations of the parties with respect to the constitutionality of the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43).

85.     Because the Agreement, Agreement 11-415, and supporting California law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) violate the Constitution, this Court should declare them unlawful.

## FIRST CAUSE OF ACTION—TREATY CLAUSE

86.     The United States incorporates by reference the allegations in Paragraphs 1 to 85 above.

87.     The Constitution prohibits states from "enter[ing] into any Treaty, Alliance, or Confederation."  Art. I, § 10, cl. [1].

88.     The Supreme Court has recognized and held that, "[w]hen a State enters the Union, it surrenders certain sovereign prerogatives.  Massachusetts cannot invade Rhode Island to force reductions in greenhouse gas emissions [and] *it cannot negotiate an emissions treaty with China or India . . . .*"  *Massachusetts*, 549 U.S. at 519 (emphasis added).

89.     The Agreement constitutes a "Treaty, Alliance, or Confederation" in violation of the Treaty Clause.

## SECOND CAUSE OF ACTION—COMPACT CLAUSE

90.     The United States incorporates by reference the allegations in Paragraphs 1 to 85 above.

91.     The Constitution prohibits states, "without the Consent of Congress," from "enter[ing] into any Agreement or Compact . . . with a foreign Power . . . ."  Art. I, § 10, cl. [3].

92.     If the Agreement is not a "Treaty, Alliance, or Confederation" under the Treaty Clause, it is an "Agreement or Compact . . . with a foreign Power" under the Compact Clause.

93.     Because Congress has not given its consent to the Agreement, nor have Defendants sought such consent, the Agreement and supporting California law as applied violate the Compact Clause.

## THIRD CAUSE OF ACTION—FOREIGN AFFAIRS DOCTRINE

94.     The United States incorporates by reference the allegations in Paragraphs 1 to 85 above.

95.     The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  Art. VI, cl. [2].

96.     Even aside from his military powers as the "Commander in Chief of the Army and Navy," Art. II, § 2, cl. [1], the Constitutions vests broad responsibility for the conduct of foreign affairs in the President of the United States.

97.     The President has "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id.* cl. [2].

98.     The President "nominate[s], and by and with the Advice and Consent of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls." *Id.*

99.     The President "receive[s] Ambassadors and other public Ministers." *Id.* § 3.

100.    The Constitution authorizes the President to "take Care that the Laws be faithfully executed." *Id.*

101.    The Supreme Court has interpreted the provisions of the Constitution that vest authority over foreign affairs in the President to prohibit actions by the states that lie outside their traditional and localized areas of responsibility and instead interfere with the federal government's foreign policy, or otherwise implicate the conduct of foreign policy.  *See Garamendi*, 539 U.S. at 418-20.

102.    The Agreement, Agreement 11-415, and supporting California law fall outside the area of any traditional state interest.

103.    Defendants' actions individually and collectively interfere with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' announcement of its intention to withdraw from the Accord, and are therefore preempted.

///

1             <u>FOURTH CAUSE OF ACTION—FOREIGN COMMERCE CLAUSE</u>

2          104.     The United States incorporates by reference the allegations in Paragraphs 1 to 85

3 above.

4          105.     The Constitution provides that "[t]his Constitution, and the Laws of the United

5 States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made,

6 under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in

7 the Constitution or Laws of any State to the Contrary notwithstanding."  Art. VI, cl. [2].

8          106.     The Constitution gives Congress "Power . . . [t]o regulate Commerce with foreign

9 Nations . . . ."  Art. I, § 8, cl. [3].

10          107.     The Supreme Court has interpreted the Foreign Commerce Clause to have a

11 negative application, in the sense that state laws that discriminate against, or impose an undue

12 burden upon, foreign commerce, are unconstitutional even in the absence of federal legislation

13 regulating the activity in question.  *See Barclays Bank PLC*, 512 U.S. at 310-13.

14          108.     The credits and offsets that covered entities may trade under the Agreement and

15 supporting California law constitute articles of commerce.

16          109.     Under the Agreement, 17 CCR §§ 95940-43, and Agreement 11-415, these credits

17 and offsets may only be imported from Quebec to California or exported from California to

18 Quebec.

19          110.     The Agreement, Agreement 11-415, and supporting California law as applied

20 (including CAL. HEALTH & SAFETY CODE § 38564, and 17 CCR §§ 95940-43) discriminate

21 among categories of foreign commerce on their face or as applied.

22          111.     California has no legitimate public interest in discriminating among categories of

23 foreign commerce.

24          112.     The Agreement, Agreement 11-415, and supporting California law as applied

25 (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) impose a

26 substantial and undue burden on foreign commerce.

27 ///

28 ///

1

**PRAYER FOR RELIEF**

2      Wherefore, the United States prays that the Court enter judgment against Defendants and

3  award the following relief:

4      a.      a declaration that the Agreement, Agreement 11-415, and supporting California

5  law as applied (including CAL. HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43)

6  violate the Constitution of the United States;

7      b.      a permanent injunction against the operation and implementation of the

8  Agreement, Agreement 11-415, and supporting California law as applied (including CAL.

9  HEALTH & SAFETY CODE § 38564 and 17 CCR §§ 95940-43) and against all other persons or

10 entities acting in active concert with Defendants to maintain the force and operation of the

11 Agreement;

12     c.      the costs of suit; and

13     d.      such additional relief as the Court deems just and proper.

14                                        Respectfully submitted,

15                                        /s/ Paul E. Salamanca
                                          JEFFREY BOSSERT CLARK
16                                        Assistant Attorney General
                                          JONATHAN D. BRIGHTBILL
17                                        Principal Deputy Assistant Attorney General
                                          PAUL E. SALAMANCA
18                                        PETER J. MCVEIGH
                                          Attorneys
19                                        Environment & Natural Resources Division
                                          U.S. Department of Justice

20

21

22

23

24

25

26

27

28